1

2

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

3

4

5

6

7

8

9

JOHN HUTCHENS, *et al.*,

        Plaintiffs,

  v.

ALAMEDA COUNTY SOCIAL
SERVICES AGENCY, and DOES 1-20,

        Defendants.

No.  C-06-06870 SBA

**ORDER**

[Docket No. 29]

10

**REQUEST BEFORE THE COURT**

11

12

13

14

15

16

17

18

19

      Before the Court is defendant Alameda County Medical Center's Motion to Dismiss (the "Motion") [Docket No. 29 in 07-5600[1]].  Plaintiffs have sued Alameda County Medical Center ("ACMC") for violating 42 U.S.C. § 1983, violating section 52.1 of the California Civil Code, battery, intentional infliction of emotional distress ("IIED"), and negligence.  ACMC requests the Court to dismiss plaintiffs' § 1983 claim for failure to state one, under Federal Rule of Civil Procedure 12(b)(6).  Under this rule, ACMC also requests the Court to dismiss plaintiffs' state law claims on the grounds they failed to timely serve a California Government Claim, ACMC is immune under state law, and for failure to plead all the claims' elements.  In turn, plaintiffs filed a Statement of Non-Opposition to the Motion as to their claims for battery and IIED.  *See* Docket No. 83-6870.

20

21

22

23

24

25

26

      For the reasons discussed below, the Court finds plaintiffs have failed to state a claim under § 1983, regarding an alleged non-consensual blood draw and drug test; but, have stated claims regarding plaintiff baby S.A.'s alleged unlawful detentions by ACMC and by an Alameda County social worker.  As for plaintiffs' state law claims, the Court finds they are time barred for failure to file a California Government Claim with ACMC, unless ACMC is estopped from claiming it is governed by a legal entity separate from Alameda County.  As a result, the Court does not reach ACMC's arguments regarding its California immunities or section 52.1.

27

28

---

[1]    As this matter comprises two consolidated matters, 06-6870 and 07-5600, docket numbers for the two matters will be indicated as #-6870 and #-5600.

As such, the Court GRANTS the Motion as follows.  Specifically, with regards to counts 3 and 4 for battery and IIED, which are unopposed, the Court DISMISSES them with prejudice.  With regards to count 1 for violating § 1983, count 2 for violating section 52.1, and count 5 for negligence, the Court DISMISSES them but grants plaintiffs leave to amend.

**BACKGROUND**

**I.    Factual History**

Plaintiffs John F. Hutchens and Zamora Moton are the natural parents and legal custodians of minor infant plaintiff, S.A.  Docket No. 26-5600 ¶ 4 (Am. Compl.).  On Friday, November 4, 2005, Moton gave birth to S.A. at Highland Hospital in Oakland, California.  *Id.* ¶ 8.  ACMC owns and manages Highland Hospital.  *Id.*  At the hospital, ACMC administered drugs to Moton which caused her to test positive for opiates. *Id.* ¶ 9.  ACMC reported the positive drug test to the Alameda County Department of Social Services ("ACSS") and placed a "hold" on S.A.  *Id.*  Neither Moton nor S.A. consented to a blood draw or to a drug screen.  *Id.* ¶ 10.

Defendant Rudolpho Hernandez, an Alameda County social worker, came to the hospital to investigate.  *Id.* ¶ 11.  ACMC told Hernandez it had prescribed codeine cough syrup to Moton and S.A. had tested negative for opiates.  *Id.*  Hernandez told the parents and ACMC the matter was resolved and there was no need for a "hold" on S.A.  *Id.*  He did, however, ask the parents if he could inspect Moton's home,[2] and Hutchens went with him to an apartment.  *Id.* at 12.  Hernandez told Hutchens everything was satisfactory, and Hutchens returned to the hospital.  *Id.*

Thereafter, ACMC told the parents that Hernandez had requested a "hold" on S.A.  *Id.* ¶ 13.  ACMC then restricted the parents' access to S.A. and would not allow Moton to be alone with S.A.  *Id.*  Moton was required to move out of her room and was given a small cot in the waiting room next to the nursery.  *Id.* ¶ 14.  She was not allowed visitors.  *Id.*

The following Monday, Hernandez advised Hutchens he had reconsidered his decision to release S.A. after reviewing Moton's history with ACSS.  *Id.* ¶ 15.  He advised Hutchens there would be a custody hearing that afternoon.  *Id.*  Hutchens and Moton attended the hearing, at ACSS'

---

[2]    It is unclear from the facts whether this was Moton's and/or Hutchens' residence.

offices. *Id.* At the hearing, Hernandez said ACMC had told him it had prescribed drugs to the mother, and that he had no further concerns about substance abuse. *Id.* ¶ 16.

Hernandez also stated he had reviewed Moton's ACSS files and found a report of what he termed "assaultive behavior" by her towards an unnamed social worker some six years earlier. *Id.* ¶ 16. Taking into account her "arrest record,"[3] he had thus placed a "hold" on S.A. *Id.* Hernandez acknowledged, however, he had no grounds to assert Hutchens was unqualified to have custody of the baby. *Id.* Hernandez and ACSS then released the "hold" on S.A., and the parents were allowed to take S.A. home from the hospital. *Id.* ¶ 17.

## II.    Procedural History

On May 2, 2006, plaintiffs served defendant County of Alameda (the "County") with a California Government Claim, which it rejected.[4] *Id.* ¶ 36. Plaintiffs alleged service of the claim on the County was also service on ACMC, because they "hold themselves out to the public as a single entity and the activities of each are so intertwined that the conduct of each should be imputed to the other." *Id.*

On November 3, 2006, Hutchens, Moton, and S.A., through his next friend Hutchens, all *pro se*,[5] sued ACSS, the Department of Children and Family Services (CFS), and Hernandez, in his official capacity, in this Court, in case 06-6870. *See* Docket No. 1-6870. On October 9, 2007, Hutchens filed a motion to join ACMC. *See* Docket No. 55-6870. On November 2, 2007, plaintiffs, now with counsel, sued ACMC, in case 07-5600, raising claims similar to those raised in 06-6870. *See* Docket No. 1-5600. Case 07-5600 was assigned to Magistrate Judge Zimmerman. *See id.* at 1. Plaintiffs in case 06-6870 then substituted in counsel. *See* Docket Nos. 60- & 65-6870. On January 14, 2008, on ACMC's declination to proceed before a magistrate judge, 07-5600 was reassigned to Judge Jenkins. *See* Docket Nos. 9-5600, 13-5600.

///

---

[3]    Plaintiffs provide no details regarding Moton's record.

[4]    Plaintiffs did not attach this claim to their Amended Complaint.

[5]    It is unclear how S.A., through his next friend Hutchens, was able to proceed *pro se*.

1    On February 7, 2008, this Court related case 07-5600 to 06-6780.  *See* Docket Nos. 72-6870

2  and 18-5600.  On March 14, 2008, ACMC filed its Motion.  *See* Docket No. 29-5600.  On April 4,

3  2008, the Court consolidated cases 06-6780 and 07-5600.  *See* Docket Nos. 80-6870 and 36-5600.

4  On April 9, 2008, plaintiffs filed their Memorandum in Opposition to the Motion (the "Opposition").

5  *See* Docket No. 82-6870.  And, on April 15, 2008, ACMC filed its Reply Memorandum re the

6  Motion (the "Reply").  *See* Docket No. 85-6870.

7                                                   **LEGAL STANDARDS**

8    Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed if it does not

9  "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When considering a

10  motion to dismiss under Rule 12(b)(6), the plaintiff's complaint is liberally construed and all well-

11  pleaded facts are taken as true.  *Syverson v. IBM Corp.*, 472 F.3d 1072, 1075 (9th Cir. 2007).

12  Conclusory allegations of law, unwarranted deductions of fact, or unreasonable inferences, however,

13  are insufficient to defeat a motion to dismiss.  *See Fields v. Legacy Health Sys.*, 413 F.3d 943, 950

14  n.5 (9th Cir. 2005); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  If

15  dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be

16  saved by any amendment.  *See Sparling v. Daou*, 411 F.3d 1006, 1013 (9th Cir. 2005), *cert. denied*,

17  546 U.S. 1172 (2006); *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002).

18    In resolving a motion to dismiss for failure to state a claim, a court may review documents

19  referenced in the pleadings, whose authenticity is undisputed, without transforming it into a motion

20  for summary judgment.  *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other*

21  *grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1123-24 (9th Cir. 2002).  Further, a

22  Court may take judicial notice as provided by Federal Rule of Evidence 201, at a party's request,

23  without transforming a motion to dismiss into one for summary judgment.  *See MGIC Indem.*

24  *Corp. v. Weisman*, 803 F.2d 500, 503 (9th Cir. 1986).  On the other hand, if "matters outside the

25  pleadings are presented to and not excluded by the" Court, a motion to dismiss "must be treated as

26  one for summary judgment" and "[a]ll parties must be given a reasonable opportunity to present all

27  the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *San Pedro Hotel Co., Inc. v. City*

28  *of Los Angeles*, 159 F.3d 470, 477 (9th Cir. 1998).

**ANALYSIS**

For the following reasons, the Court GRANTS the Motion with leave to amend.

**I.   Plaintiffs have stated a claim under 42 U.S.C. § 1983.**

**A.      Section 1983 of title 42 and *Monell v. Department of Social Services***

Section 1983 of title 42 states:

Every person who, under color of any statute, ordinance, regulation, custom, or

usage, of any State . . . subjects, or causes to be subjected, any citizen of the United

States . . . to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws, shall be liable to the party injured in an action at law, suit in

equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

A public entity, however, is only liable under 42 U.S.C. § 1983 where it has a *policy, custom,*

*or practice* that violates the constitutional rights of an individual. *Monell v. Dep't of Soc. Servs.*,

436 U.S. 658, 691 (1978). It bears no vicarious liability for the acts or omissions of its employees.

*Id.* A plaintiff may establish *Monell* liability by showing a constitutional tort resulted either from

actions or inactions of an entities' agents, taken pursuant to its policies, customs, or practices. *Lee v.*

*City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001). In the latter case, a plaintiff must show:

(1) they were deprived of their constitutional rights by defendants and their

employees acting under color of state law; (2) that the defendants have customs or

policies which " 'amount[ ] to deliberate indifference' " to their constitutional rights;

and (3) that these policies are the " 'moving force behind the constitutional

violation[s].' "

*Id.* at 681-82 (quoting *Oviatt v. Pearce*, 954 F.2d 1470, 1473, 1477 (9th Cir. 1992) (quoting *City of*

*Canton v. Harris*, 489 U.S. 378, 389-91 (1989))).

With regards to the second element, the Ninth Circuit has held:

[D]eliberate indifference to a person's constitutional rights occurs when the need for

more or different action, "is so obvious, and the inadequacy [of the current

procedure]

5

1  ///

2  ///

3       so likely to result in the violation of constitutional rights, that the policymakers . . .

4       can reasonably be said to have been deliberately indifferent to the need."

5  *Lee*, 250 F.3d at 682 (quoting *City of Canton*, 489 U.S. at 390).

6       And, with regards to the third element, the Ninth Circuit has held the terms "moving force"

7  merely mean "legal" or "proximate" cause.  *Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355

8  (9th Cir. 1981).

9       **B.    Plaintiffs have not stated a *Monell* claim for the blood draw or drug test, but**

10      **have stated a claim for S.A.'s detention.**

11      In their Amended Complaint, plaintiffs allege three constitutional deprivations by ACMC's

12  agents: a non-consensual blood draw from Moton and S.A., a non-consensual drug test of these

13  draws, and S.A.'s unlawful detention.  For the reasons stated below, plaintiffs have failed to state a

14  *Monell* claim for the blood draw or drug test, but have stated a claim for S.A.'s detention.

15      **1.    The Blood Draw and Drug Test**

16      **a.    Plaintiffs have failed to allege a lack of consent.**

17      In their Amended Complaint, plaintiffs allege ACMC drew blood from Moton and S.A. as

18  part of a pattern and practice of conducting surreptitious, non-consensual screenings for illicit drugs

19  in mothers, without probable cause or reasonable suspicion they use drugs.  Am. Compl. ¶ 25.  On

20  the specific issue of consent, plaintiffs allege they "are informed and believe and on that basis allege

21  that ACMC did not have consent to draw blood from Moton or Baby S.A. or conduct a drug screen

22  for the presence of opiates or any other drug."  Am. Compl. ¶ 10.  This allegation is insufficient even

23  under the liberal pleadings standard of Federal Rule of Civil Procedure 8.

24      Although Rule 8 only requires, "a short and plain statement of the claim showing that the

25  pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2); *Leatherman v. Tarrant County Narcotics*

26  *Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993); *Lee*, 250 F.3d at 679, an *isolated*

27  conclusory statement made on information and belief is entitled to no weight, due to a lack of

28  personal knowledge, *see Bank Melli Iran v. Pahlavi*, 58 F.3d 1406 (9th Cir. 1995).  This is because a

1    party must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon

2    which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47 (1957), *abrogated on other grounds by Bell Atl.*

3    *Corp. v. Twombly*, __ U.S. ___, 127 S.Ct. 1955 (2007); *Yamaguchi v. U.S. Dep't of the Air Force*,

4    109 F.3d 1475, 1481 (9th Cir. 1997).  This allows the parties to avoid unnecessary discovery into

5    baseless claims.  *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 328 (4th Cir. 2001).

6            Further, under Rule 8, "Pleading on information and belief is a desirable and essential

7    expedient when matters that are necessary to complete the statement of a claim are not within the

8    knowledge of the plaintiff but he [or she] has sufficient data to justify interposing an allegation on

9    the subject."  5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1224

10   (2d ed. 1990).  "However, pleading on information and belief is not an appropriate form of pleading

11   if the matter is within the personal knowledge of the pleader or 'presumptively' within his

12   knowledge, unless he [or she] rebuts that presumption."  *Id.*

13           Here, Moton or Hutchens presumptively know whether or not ACMC had consent for the

14   blood draws or drug tests.  Plaintiffs, however, fail to rebut this presumption.  That is, they fail to

15   explain whether Moton expressly refused consent, was unable to consent, was never asked to

16   provide consent, or otherwise discuss this issue.  Nor can the Court or defendants tell whether the

17   same type of consent or lack thereof applies to both the blood draw and the drug test.  Thus,

18   plaintiffs have failed to put defendant on notice as to what it should defend against.  As such, the

19   Court finds plaintiffs have failed to state a constitutional violation predicated on an alleged non-

20   consensual blood draw or drug test.  Nonetheless, because plaintiffs may be able to cure this defect

21   by amendment, the Court grants them leave to amend paragraph 10 of their Amended Complaint to

22   conform to Rule 8.

23           **b.       ACMC has failed to show its testing falls under the "special**

24                     **needs" doctrine.**

25           In its Motion, ACMC denies performing any non-consensual blood draws or drug

26   screenings, but argues, assuming it did, it would have been in the context of providing medical care,

27   and thus legal under the Fourth Amendment, under *Ferguson v. City of Charleston*, 532 U.S. 67

28   (2001).  Mot. at 10:24-11:3.  In *Ferguson*, a state-run hospital, and other agencies, including law

7

1   enforcement and prosecutors, developed a plan, including chain-of-custody guidelines, to test

2   pregnant women for drug use, then threaten users with prosecution if they did not seek treatment.

3   *Ferguson*, 532 U.S. at 70-72.  Women who did not follow through or who tested positive post-labor,

4   were subject to prosecution.  *Id.*  The testing was not part of any prenatal care, and positive results

5   did not result in care changes or newborn treatment.  *Id.* at 73.

6          Ten women who were arrested, sued.  *Id.* at 73.  Defendants claimed the women had

7   consented to the testing, or if they had not, the testing was justified by "special non-law-enforcement

8   purposes."  *Id.*  The district court sent the case to a jury on the consent defense, but rejected the

9   second defense, finding the testing was for law enforcement purposes, and not independent medical

10  purposes.  *Id.* at 73-74.  The jury found consent.  *Id.* at 74.  On appeal, a majority of a Fourth Circuit

11  panel affirmed, but declined to consider the issue of consent, instead holding the "special needs"

12  doctrine justified the testing.  *Id.* at 74-75.  The Supreme Court granted certiorari, to consider

13  whether this doctrine justified the testing.  *Id.* at 76.

14         In its holding, the Court noted the term "special needs" refers to those:

15         limited exceptions to the probable-cause requirement, in which reasonableness is

16         determined by "a careful balancing of governmental and private interests," . . . [and]

17         should only be applied "in those exceptional circumstances in which special needs,

18         beyond the normal need for law enforcement, make the warrant and probable-cause

19         requirement impracticable. . . ."

20  *Ferguson*, 532 U.S. at 74 n.7 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun,

21  J., concurring)).

22         As a threshold matter, the Supreme Court assumed, for purposes of its analysis, that the

23  testing was non-consensual.  *Id.* at 76.  The Court also noted the hospital's members were state

24  actors, subject to the Fourth Amendment, which recognizes urine drug testing as "searches."  *Id.*

25  Further, the Court noted the testing was clearly unrelated to any reasonable suspicion or probable

26  cause regarding drug use.  *Id.*

27         The Supreme Court then noted the difference between the case before it, in which the

28  hospital wanted to test in order to turn the results over to law enforcement, and four earlier cases in

8

1  which the Court considered "whether comparable drug tests 'fit within the closely guarded category

2  of constitutionally permissible suspicionless searches.' "  *Id.* at 77 (quoting *Chandler v. Miller*, 520

3  U.S. 305, 309 (1997)).  The Court noted that in three of these cases, it sustained drug tests for

4  railway employees involved in accidents, *R.R. Labor Executives' Assn.*, 489 U.S. 602 (1989), for

5  United States Customs Service employees seeking promotion to certain sensitive positions, *Treasury*

6  *Employees v. Von Raab*, 489 U.S. 656 (1989), and for high school students participating in sports,

7  *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995).  In the fourth case, *Chandler*, the Court

8  struck down as unreasonable, tests for candidates for state offices.

9      In each of these cases, the Court balanced the intrusion on the individual's privacy interests

10  against the "special needs" of the program.  *Ferguson*, 532 U.S. at 78.  The Court then held the

11  hospital's testing was substantially and far more invasive than in these earlier cases.  *Id.*  In these

12  cases, "there was no misunderstanding about the purpose of the test or the potential use of the test

13  results, and there were protections against the dissemination of the results to third parties."  *Id.*  The

14  Court noted unauthorized dissemination to third parties is far more serious than exclusion from an

15  extracurricular activity.  *Id.*  Further, the "reasonable expectation of privacy enjoyed by the typical

16  patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared

17  with nonmedical personnel without her consent."  *Id.*  The Court concluded that this type of

18  intrusion would deter patients from seeking care.  *Id.*

19      The Supreme Court then held the "critical difference" between the matter before it and the

20  four earlier cases was that the "special need" in them that was "advanced as a justification for the

21  absence of a warrant or individualized suspicion was one divorced from the State's general interest

22  in law enforcement."  *Id.* at 79.  The Court then held:

23          In this case, however, the central and indispensable feature of the policy from its

24          inception was the use of law enforcement to coerce the patients into substance abuse

25          treatment.  This fact distinguishes this case from circumstances in which physicians

26          or psychologists, in the course of ordinary medical procedures aimed at helping the

27          patient herself, come across information that under rules of law or ethics is subject to

28          reporting requirements . . . .

9

1    *Id.* at 80.

2    ///

3    As examples, the Court cited common physician duties to report a patient who threatens serious

4    bodily harm to themselves or another, intentionally inflicted knife or gunshot wounds, or suspected

5    child abuse or neglect.  *Id.*

6            In a footnote, the Supreme Court also held:

7            While the existence of such laws might lead a patient to expect that members of the

8            hospital staff might turn over evidence acquired in the course of treatment to which

9            the patient had consented, they surely would not lead a patient to anticipate that

10           hospital staff would intentionally set out to obtain incriminating evidence from their

11           patients for law enforcement purposes.

12   *Id.* at 78 n.13.

13           While the hospital argued its ultimate purpose and motive was to benefit pregnant women,

14   the Court said a "close review" of all evidence of the entire scheme showed its ultimate purpose was

15   indistinguishable from a general interest in crime control.  *Id.* at 81.  As such, because the hospital's

16   specific purpose was to obtain incriminating evidence, they had to comply with the Fourth

17   Amendment, and advise patients of their constitutional rights, so they could knowingly decide

18   whether or not to they were willing to voluntarily waive their rights.  *Id.* at 85.

19           ACMC advances three arguments why, unlike the hospital in *Ferguson*, its blood draw and

20   drug testing is justified under the "special needs" doctrine.  First, it argues it did not test *solely* to

21   turn over positive results to a social worker.  It argues, unlike the hospital staff in *Ferguson*, it took a

22   blood draw in the context of providing Moton and S.A. with delivery-related medical services.  Mot.

23   at 11:14-15.  Specifically, it drew to determine Moton's blood type, should a transfusion be required

24   before or after delivery, to determine her and S.A.'s general health, to detect birth complications, or

25   to avoid disease transmission from Moton to S.A.  *Id.* at 11:14-21.  The Court notes whether or not

26   these undeclared statements are true, under Rule 12(b)(6), the Court's focus is on plaintiffs'

27   ///

28   ///

10

1  ///

2  ///

3  allegations, which do not mention any such use of Moton's or S.A.'s blood draws.[6]  As a result,

4  ACMC's first argument fails to show its practices fall under the "special needs" doctrine.

5      ACMC's second argument is the blood draw and drug test were medically necessary and the

6  only way to detect for the presence of legal or illegal narcotics in Moton or S.A., and provide

7  appropriate medical services, during delivery.  *Id.* at 11:20-23, 12:10-17.  The Court notes this is an

8  evidentiary issue unsuitable for consideration in a Rule 12(b)(6) motion.  First, there are no

9  allegations in plaintiffs' complaint asserting the blood sample was medically necessary for detecting

10  narcotics or for providing appropriate delivery medical services.[7]  Second, ACMC is asking the

11  Court to find, without any medical expert testimony before it, that all mothers in all deliveries must

12  have a blood draw and a drug test, whether they consent to one or not, and even if they refuse one.[8]

13  As a result, ACMC's second argument fails to show its practices fall under the "special needs"

14  doctrine.

15      ACMC's third argument is that if it did test Moton and S.A. *solely* to determine whether S.A.

16  was at risk for abuse or neglect, then under *Ferguson*, it did not violate the Fourth Amendment.

17  This Court notes the Supreme Court in *Ferguson* struck down a program of drug-testing pregnant

18  women, without their consent, done solely for *law enforcement purposes*.  While this *might* invite a

19  court to uphold a program of drug-testing pregnant women, without their consent, done solely for

20  *non-law enforcement purposes*, this Court is unable to do so here for two reasons.  First, in bringing

21

---

22  [6]    The Court notes in ruling on ACMC's argument in the context of a motion to dismiss, the
       Court is expressing no opinion as to how it would rule if it had declarations before it and were
23     considering this argument under a motion for summary judgment under Federal Rule of Civil
       Procedure 56.

24
25  [7]    In its Reply, much of which is repetitious of its Motion, ACMC argues plaintiffs failed to
       *deny* in their Opposition that the testing was for legitimate medical purposes, Reply at 4:16-17.
26     Under Rule 12(b)(6), however, plaintiffs need not address in its Opposition, this new factual
       allegation raised by ACMC in its Motion.

27  [8]    The Court does not question the utility of a blood draw and drug test, but given women have
       been delivering children for thousands of years without them, the Court is unprepared to rule as a
28     matter of law that a blood draw and a drug test, regardless of a mother's consent, is an essential
       precondition to delivery.

1    its Motion, ACMC bears the burden of persuasion.  In its Motion, however, it does not perform the

2    balancing test called for in *Ferguson*.  That is, it does not balance "the intrusion on the individual's

3    privacy interests against the 'special needs' that supported the program."  Nor, does it point the

4    Court to any case law or statute which provides for the blanket covert drug screening program it

5    envisions.[9]

6          Second, the *consent* language in *Ferguson* is problematic for ACMC.  In *Ferguson*, the Court

7    distinguished the drug testing program before it from a situation where "hospital staff might turn

8    over evidence acquired in the course of treatment to which the patient had *consented* . . . ."  532 U.S.

9    at 78 n.13 (emphasis added).  It also held the "reasonable expectation of privacy enjoyed by the

10   typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be

11   shared with nonmedical personnel without her *consent*."  *Id.* at 78 (emphasis added).  The Court also

12   distinguished the drug-testing program at issue from its earlier decisions upholding the "special

13   needs" doctrine in situations where "there was no misunderstanding about the purpose of the test or

14   the potential use of the test results . . . ."  *Id.*  Thus, the Court declines to find that under *Ferguson*,

15   ACMC did not violate the Fourth Amendment, if it solely tested Moton and S.A. to determine

16   whether S.A. was at risk for abuse or neglect, even if Moton did not consent to testing.  As such,

17   ACMC's third argument fails to show its practices fall under the "special needs" doctrine.

18          **2.    S.A.'s Detention**

19                 **a.    ACMC's Hold**

20          Plaintiffs have stated a *Monell* claim for ACMC's hold on S.A.  In their Amended

21   Complaint, plaintiffs allege ACMC seized S.A. as part of a pattern and practice of removing children

22   from their parents without a warrant, adequate investigation, or probable cause the children are in

23   imminent harm of physical injury or death or at risk of abuse or neglect.  Am. Compl. ¶ 24.

24   _____

25   [9]    ACMC's reference to *Sanchez v. County of San Diego*, 464 F.3d 916, 918 (9th Cir. 2006),
     which upheld warrantless walk-throughs of welfare applicants' homes, to confirm eligibility, was
26   not helpful.  Mot. at 11:11-13.  This is especially so where, as plaintiffs note in their Opposition, the
     court found the applicants consented to the walk-throughs, which the court held were not "searches,"
27   under the Fourth Amendment.  *Id.* at 919-21; Opp'n at 7:2-6.  By the same token, however,
     plaintiffs' argument that social workers are subject to the Fourth Amendment, just like law
28   enforcement agents, Opp'n at 6:18-27, is of little help, as the Court is hard pressed to think of any
     agent of any public entity who is not covered by the Fourth Amendment, when effecting a search.

1   Plaintiffs argue ACMC's conduct violated their right to liberty and procedural due process,

2   unreasonably interfered with their parent-child relationship, was an unreasonable search and seizure,

3   and arbitrarily intruded upon their physical and emotional well being. *Id.* ¶ 23. Section 306(a)(2) of

4   the California Welfare & Institutions Code provides a social worker may:

5        Take into and maintain temporary custody of, without a warrant, a minor . . . who the

6        social worker has reasonable cause to believe is a person described in subdivision (b)

7        or (g) of Section 300, and the social worker has reasonable cause to believe that the

8        minor has an immediate need for medical care or is in immediate danger of physical

9        or sexual abuse or the physical environment poses an immediate threat to the child's

10       health or safety.

11  Cal. Welf. & Inst. Code § 306(a)(2).[10]

12       In turn, section 300(b) states:

13       The child has suffered, or there is a substantial risk that the child will suffer,

14       serious physical harm or illness, as a result of the failure or inability of his or her

15       parent or guardian to adequately supervise or protect the child, or the willful or

16       negligent failure of the child's parent or guardian to adequately supervise or protect

17       the child from the conduct of the custodian with whom the child has been left, or by

18       the willful or negligent failure of the parent or guardian to provide the child with

19       adequate food, clothing, shelter, or medical treatment, or by the inability of the parent

20       or guardian to provide regular care for the child due to the parent's or guardian's

21       mental illness, developmental disability, or substance abuse.

22  *Id.* § 300(b).

23       The first element of a *Monell* claim is a constitutional deprivation by persons acting under

24  color of state law. ACMC does not dispute its agents acted under color of state law. Nor does it

25  dispute that plaintiffs have a protected constitutional interest in their liberty and familial

26

27  _____

28  [10]    Section 300(g) addresses a lack of financial support, a voluntary surrender of a child's
    custody, or parental incarceration, which issues appear inapplicable here.

association.[11]  ACMC first argues, rather, it is an entity separate and independent of the County, and thus it did not make or have any say in the County's or ACSS' policies, customs, or practices, nor how County employee Hernandez implemented them.  Mot. at 6:22-8:6.  Thus, when he placed a hold on S.A., it was not attributable to ACMC's policies, customs, or practices.  *Id.*

As an initial matter, the Court notes ACMC has failed to take note of the standard applicable to motions to dismiss, which is to take plaintiffs' allegations as true and determine if they have stated a claim.  That said, as discussed *infra*, in part II.B, the Court agrees ACMC is an entity independent of the County.  As the following analysis demonstrates, however, this does not prevent ACMC from coordinating its policies, procedures, or customs with the County or Hernandez, or forming joint ones.

For example, in plaintiffs' Opposition, they point out they allege in their Amended Complaint that *ACMC* placed a hold on S.A., after Moton tested positive for drug use, but before ACMC had contacted Hernandez.  Opp'n at 8:15-16.  ACMC argues, however, it was merely following protocol, under California Penal Code section 11165.13 and Health and Safety Code section 123605.  Mot. at 8:18-9:1.  It argues these statutes require it to perform a "needs assessment," when a delivering mother tests positive for drugs, prior to a newborn leaving ACMC.  *Id.*  And if necessary, to make a report to a social worker.  *Id.*  The Amended Complaint, however, does not allege that such a need assessment was conducted.

California Penal Code section 11165.13 states, in part:

a positive toxicology screen at the time of the delivery of an infant is *not in and of itself* a sufficient basis for reporting child abuse or neglect.  However, any indication of maternal substance abuse shall lead to an assessment of the needs of the mother

---

[11]    Nor could it, as unconstitutional detentions of family members will give rise to § 1983 claims.  *See Lee*, 250 F.3d 683-86 (9th Cir. 2001) (Loss of liberty implicates Fourteenth Amendment, seizure implicates Fourth Amendment, and familial interference implicates First and Fourteenth Amendment.).  ACMC does allege in a footnote that plaintiffs claims should be brought under the Fourteenth Amendment, rather than Fourth Amendment, citing to *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991), discussing interference with familial association.  Mot. at 6 n.4.  ACMC seems to forget, however, that plaintiff S.A. has a Fourth Amendment right against unreasonable search and seizure.  *See, e.g.*, *Mabe v. San Bernardino County, Dept. of Pub. Soc. Servs.*, 237 F.3d 1101, 1111 (9th Cir. 2001).

1    and child pursuant to Section 123605 of the Health and Safety Code.  If other factors

2    are present that indicate risk to a child, then a report shall be made.

3  Cal. Penal Code § 11165.13 (emphasis added).

4        In turn, section 123605 of the Health and Safety Code requires the needs assessment called

5  for in section 11165.13 "shall" be performed before a substance-exposed newborn leaves the

6  hospital.  Cal. Health & Safety Code § 123605(a)-(b).  The purpose of the assessment is to

7  determine services needed for the mother and infant, *id.* § 123605(c)(2), and to "[d]etermine the

8  level of risk to the newborn upon release to the home and the corresponding level of services and

9  intervention, if any, necessary to protect the newborn's health and safety, including a referral to the

10  county welfare department for child welfare services."  *Id.* § 123605(c)(2).

11        Rather clearly, plaintiffs allege ACMC obtained a positive drug test, and on that ground,

12  contacted Hernandez.  Plaintiffs do not allege ACMC conducted the needs assessment, which

13  ACMC asserts as the basis for its agents' actions.  Nor can this reasonably be inferred from

14  plaintiffs' allegations.  Plaintiffs do allege, however, after ACMC's agents called Hernandez, he

15  came to ACMC, where its agents told him their drugs had caused Moton's positive drug test.  He

16  then said there was no need for a hold, and it was lifted.

17        As an initial matter, plaintiffs' allegations, taken as true, do not show ACMC complied with

18  Penal Code section 11165.13 or Health and Safety Code section 123605.  Further, the Court notes,

19  even if plaintiffs had alleged ACMC conducted a needs assessment, ACMC never explains how this

20  practice would be constitutional, if it were triggered by a positive drug test caused by drugs

21  administered by ACMC, where plaintiffs allege ACMC has a pattern and practice of removing

22  children *without adequate investigation or probable cause to do so*.  As such, ACMC's argument

23  predicated on these statutes does not show a failure by plaintiffs to state a *Monell* claim.[12]  In

24  addition, taking plaintiffs' allegations as true, ACMC held S.A. under its own policies, practices, or

25  customs, though it did coordinate its hold with Hernandez.  Thus, even though ACMC is an entity

26  independent of the County, because its several or joint customs or practices were the moving force

27  _____

28  [12]    The Court also notes ACMC does not point the Court to any authority for imposing a hold on
    its own.

1  behind plaintiffs' constitutional deprivation, i.e., ACMC's unlawful hold on S.A., plaintiffs have

2  stated a claim under *Monell* for this hold.

3  ///

4  ### b.    Hernandez's Hold.

5  Plaintiffs have stated a *Monell* claim for Hernandez's hold on S.A.  After the initial hold was

6  lifted, Hernandez investigated Moton and *at Hernandez's request*, ACMC instituted a second hold.

7  Am. Compl. ¶¶ 11-13.  In its Motion, ACMC asserts it was not responsible for this second hold, as

8  *Hernandez* took S.A. into custody, under section 306(a)(2) of the Welfare and Institutions Code.

9  Mot. at 8:7-12, 9:1-8.  ACMC thus argues even if Hernandez violated 42 U.S.C. § 1983, it merely

10  *observed* his actions, and thus cannot be held vicariously liable under *Monell*.  Mot. at 8:7-17,

11  12:24-13:24.  Likewise, ACMC argues its polices or customs were not the moving forces behind

12  Hernandez's violations.  Mot. at 13:15-14:2.

13  In support of its argument, ACMC notes section 308(a) of the Welfare and Institutions Code

14  allows a social worker, after instituting a hold, to place a child in "a facility authorized by law to

15  care for the child . . . ."  Welf. & Inst. Code § 308(a).  In turn, section 309(b) of the same code

16  provides:

17  In any case in which there is reasonable cause for believing that a child who is

18  under the care of a physician or surgeon or a hospital, clinic, or other medical facility

19  and cannot be immediately moved and is a person described in Section 300, the child

20  shall be deemed to have been taken into temporary custody and delivered to the

21  social worker for the purposes of this chapter while the child is at the office of the

22  physician or surgeon or the medical facility.

23  Cal. Welf. & Inst. Code § 309(b).

24  ACMC argues that, after Hernandez instituted his hold, S.A. was kept at ACMC, pursuant to

25  section 309(b).  According to plaintiffs' allegations, ACMC implemented the hold by limiting her

26  and Hutchens' access to S.A. and denying her any unsupervised access to S.A.

27  In their Opposition, plaintiffs argue that section 309 only applies when a social worker has

28  received a child from another person who removed the child from his or her parents or legal

16

guardians, which is not the case here.  Opp'n at 9:3-5.  The Court notes section 309(a) states, in part:

> Upon delivery to the social worker of a child who has been taken into temporary custody under this article, the social worker shall immediately investigate the circumstances of the child and the facts surrounding the child's being taken into custody and attempt to maintain the child with the child's family through the provision of services.  The social worker shall immediately release the child to the custody of the child's parent, guardian, or responsible relative unless one or more of the following conditions exist:  . . . .

Cal. Welf. & Inst. Code § 309(a).

On the one hand, section 309(a) addresses a social worker's duties after a child is taken into temporary custody and "delivered" to them.  On the other hand, section 309(b) provides a child receiving medical care, under certain circumstances, may be "deemed" to have been taken into temporary custody and delivered to a social worker.  Plaintiffs appear to argue subdivision (b) cannot apply to S.A., because S.A. was not processed under subdivision (a).  These subdivisions, however, appear to operate independently and provide two separate paths by which a child may be taken into temporary custody and delivered to a social worker, or at least deemed as such.  Nor do plaintiffs provide any statutory or case law to dispute a plain reading of these subdivisions.  Thus, the Court finds unpersuasive their argument that Hernandez could not avail himself of section 309(b).

Plaintiffs next argue that *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000) prohibits third parties from accepting holds over the telephone from social workers.  Opp'n at 9:6-23.  The Court notes the Ninth Circuit held no such thing.  In reviewing a summary judgment determination, the Court found there were disputed facts as to whether there was a practice of police officers picking up children, in response to telephone calls from social workers telling them there were juvenile petitions on file, or court orders requiring a pick-up, when no such documents existed.  *Wallis*, 202 F.3d at 1137, 1139 n.9, 1142-43.  In this case, in contrast, as ACMC notes in its Reply, plaintiffs allege Hernandez requested ACMC hold S.A.  Reply at 2:20-23.  But, plaintiffs do not allege Hernandez did so by claiming he had court authority to do so, where none actually existed.  Thus,

17

1   plaintiffs' second argument does not refute ACMC's contention that it should not be liable under

2   *Monell*, merely for observing Hernandez's allegedly illegal actions.

3       Nonetheless, the Court finds plaintiffs have stated a *Monell* claim for this hold.  In regards to

4   Hutchens and S.A., plaintiffs allege that Hernandez admitted that Hutchens was qualified to have

5   custody of S.A.  Thus, plaintiffs allege that Hernandez had no legal grounds to detain S.A. from

6   Hutchens.  In regards to Moton and S.A., Hernandez allegedly based his decision to hold S.A. on

7   Moton's arrest record and a six-year-old assaultive incident involving a social worker.  Without

8   more information, it us unclear whether Hernandez had sufficient information to support a detention.

9   This Court, however, must liberally construe plaintiffs' allegations in a light most favorable to them.

10  *Syverson*, 472 F.3d at 1075; *see Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.

11  1995).  As such, the Court cannot find as a matter of law that plaintiffs have failed to assert that

12  Hernandez lacked legal grounds on which to detain S.A. from Moton.

13      ACMC argues, however, if Hernandez illegally instituted the second hold, ACMC was a

14  mere observer, and cannot be held vicariously liable under *Monell*, nor could its policies and

15  customs have been the moving forces behind Hernandez's violations.  Limited under Rule 12(b)(6)

16  to only considering plaintiffs' allegations in a light most favorable to them, the Court has difficulty

17  with both of these arguments.  Turning first to the policy argument, the Court first notes plaintiffs

18  allege ACMC has a pattern and practice of removing children from their parents without a warrant,

19  adequate investigation, or probable cause that the children are in imminent harm of physical injury

20  or death or at risk of abuse or neglect.  Am. Compl. ¶ 24.  *They do not restrict this allegation to one*

21  *detention or the other.*  The Court also notes the events complained of all transpired within four

22  days, from Friday through Monday.  And, as already discussed, plaintiffs have pled a *Monell* claim

23  predicated on ACMC detaining S.A. after it administered drugs which caused Moton to test positive

24  for drug use.  Construing all of plaintiffs' allegations in their favor, ACMC's pattern and practice

25  allowed it to treat Moton's positive drug test as grounds for contacting Hernandez, rather than

26  dismissing it as generated by ACMC's own medications.  In turn, ACMC was able to hold S.A.,

27  pending Hernandez's arrival.  He then arrived and "released" S.A.  Nonetheless, he *then investigated*

28  Moton and Hutchens and "reconsidered" his prior release.  *See* Am. Compl. ¶ 15.  Fairly read, he

"re-instituted" the first hold by "requesting" ACMC hold S.A., which it did by separating Moton from S.A., and denying her any visitors.[13]  On Monday, the hold was lifted after a custody hearing, during which, *inter alia*, Hernandez admitted he had no grounds to detain S.A. from Hutchens.  In general terms, ACMC and County social workers have allegedly developed a system to subvert constitutional protections, without, if one follows ACMC's arguments, exposing ACMC to liability under § 1983.  If these allegations were true, ACMC would not be a mere observer in S.A.'s second hold, and plaintiffs have thus stated a *Monell* claim in its regard.

Turning to ACMC's causation argument.  In the Ninth Circuit, under *Monell*, the "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation but also *by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury*."  *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 836 (9th Cir. 1996) (*quoting Bateson v. Geisse*, 857 F.2d 1300, 1304 (9th Cir. 1988) (*quoting Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987))) (emphasis added and removed).  As the *Van Ort* court held:

> Traditional tort law defines intervening causes that break the chain of proximate causation.  Prosser and Keeton on Torts § 44, at 312 (5th ed.1984).  This analysis applies in section 1983 actions.  *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989) ("An unforeseen and abnormal intervention . . . breaks the chain of causality, thus shielding the defendant from [section 1983] liability." (quotations omitted)); *Dodd v. City of Norwich*, 827 F.2d 1, 6 (2d Cir. 1987) (*Dodd*) (a "policy [is] a proximate cause ... if [ ] intervening actions were within the scope of the original risk and therefore foreseeable" (quotations omitted)), *cert. denied*, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 653 (1988).

*Van Ort*, 92 F.3d at 837.

The Court finds plaintiffs have sufficiently alleged ACMC's policies and customs were a moving force behind S.A.'s second hold.  If ACMC actually implemented the policies and customs

---

[13]    Taken as true, the Court notes this final "isolation" allegation does not support finding ACMC was a mere "observer" in implementing S.A.'s second hold.

alleged, S.A.'s second hold would have resulted by their design.  As such, they would clearly be the moving forces behind it.  Further, given the constitutional protections at issue here are designed to guard against unlawful detentions or familial disruptions, it is difficult to find Hernandez's second hold not proximately related to ACMC's first hold, as ACMC's false substance abuse reports to Hernandez clearly created the risk of an unlawful detention.  That is, ACMC may not place the second hold solely on Hernandez's shoulders, when his investigation was hardly an unforseen or abnormal risk of ACMC initiating his intervention.  Thus, because ACMC's several or joint customs or practices were the moving force behind plaintiffs' constitutional deprivation, i.e., Hernandez's unlawful hold on S.A., plaintiffs have stated a claim under *Monell* for it.

## II.    Plaintiffs' state law claims are time barred, unless ACMC is estopped from denying its existence independent of the County.

### A.    The California Government Claims Act

Under the California Government Code, persons seeking money or damages from California public entities, except for certain exceptions inapplicable here, must comply with the claims presentation requirements of the California Government Claims Act (the "Act"), Cal. Gov. Code § 900 *et seq*.  Cal. Gov. Code § 905; *City of Stockton v. Super. Ct.*, 42 Cal.4th 730, 737-38, 171 P.3d 20 (2007).

A claim for a personal injury must be presented within six months of accrual.  Gov. Code § 911.2(a); *State of Cal. v. Superior Ct. (Bodde)*, 32 Cal.4th 1234, 1239, 90 P.3d 116, 13 Cal.Rptr.3d 534 (2004).  Until a claimant has properly presented a claim to a public entity, and the public entity has acted on it or it is deemed rejected in accordance with the Act, the claimant may not file suit against that entity.[14]  Gov. Code § 945.4; *Bodde*, 32 Cal.4th at 1239.  The failure to timely present a claim bars a person from filing a lawsuit against that entity.[15]  *Bodde*, 32 Cal.4th at 1239.  A party who fails to timely file a claim in the six-month period, however, may file an application with a

---

[14]    A plaintiff, however, who sues *prior* to presenting a claim, will not be barred from suing, if post-suit they timely present a claim under the Act.  *Bodde*, 32 Cal.4th at 1243-44.

[15]    In addition, a plaintiff's "failure to allege facts demonstrating or excusing compliance with the claim presentation requirement subjects a claim against a public entity to [dismissal] for failure to state a cause of action."  *Bodde*, 32 Cal.4th at 1239.

1  public entity for permission to file a late claim, which will be granted under certain statutory

2  conditions, but they must apply within one year their claim accruing.  Gov. Code § 911.4; *County of*

3  *Los Angeles v. Super. Ct.*, 26 Cal.Rptr.3d 445, 452, 127 Cal.App.4th 1263 (2005).

4      The Act's purpose is not "to prevent surprise, but 'to provide the public entity sufficient

5  information to enable it to adequately investigate claims and to settle them, if appropriate, without

6  the expense of litigation.' "  *City of Stockton*, 42 Cal.4th at 738 (quoting *City of San Jose v. Super.*

7  *Ct.*, 12 Cal.3d 447, 455, 115 Cal.Rptr. 797, 525 P.2d 701 (1974)).

8      In this case, S.A.'s alleged detention ended on November 6, 2005.  Am. Compl. ¶¶ 8, 15-17.

9  On May 2, 2006, or six months later, plaintiffs filed a claim with the County.  *Id.* ¶ 36. Plaintiffs do

10  not allege they filed a claim with ACMC, nor do they allege they filed an application for leave to file

11  a late claim with ACMC.  Instead, plaintiffs allege presenting a claim to the County constitutes

12  presentment to ACMC, because the County and ACMC "hold themselves out to the public as a

13  single entity and the activities of each are so intertwined that the conduct of each should be imputed

14  to the other."  Amend. Compl. ¶ 36.  The deadline to present a claim to ACMC expired on May 2,

15  2006.  Gov. Code § 911.2(a).  The deadline to present an application for leave to file a late claim to

16  ACMC expired on November 6, 2006.  *Id.* § 911.4.  Thus, plaintiffs' state law claims against ACMC

17  are time barred, unless ACMC is estopped from claiming it is an independent entity.  *See Munoz v.*

18  *State of California*, 33 Cal.App.4th 1767, 1787, 39 Cal.Rptr.2d 860 (1995).

19      **B.      ACMC is governed by an entity legally separate and independent from the**

20          **County.**

21      As a threshold issue, the Court addresses ACMC's legal status.  In its Motion, ACMC notes

22  that under section 101850 of the California Health and Safety Code, it is governed by a legal entity

23  separate from the County.  Mot. at 7:6-19.  Subdivision (a)(1) of this section states the California

24  legislature enacted section 101850 to provide authority to the Alameda County Board of Supervisors

25  to transfer ACMC to an "independent governing body" or "Hospital Board."  Cal. Health & Safety

26  Code § 101850(a)(1).  As subdivision (j) states:

27          A hospital authority created pursuant to this chapter shall be a *legal entity*

28          *separate and apart from the county* and shall file the statement required by

21

1  Section 53051 of the Government Code.  The hospital authority shall be *a*

2  *government entity separate and apart from the county*, and *shall not be considered to*

3  *be an agency, division, or department of the county*.  The hospital authority shall not

4  be governed by, nor be subject to, the charter of the county and shall not be subject to

5  ///

6  policies or operational rules of the county, including, but not limited to, those relating

7  to personnel and procurement.

8  *Id.* § 101850(j) (emphasis added).

9      The reference to section 53051 of the Government Code is quite telling.  This section

10  requires the California Secretary of State to establish a "Roster of Public Agencies."  Gov. Code

11  § 53051(c).  By definition, it includes every "district, *public authority*, public agency, and any other

12  political subdivision or public corporation in the state, but does not include the state or a county, city

13  and county, or city."  *Id.* § 53050.  Section 53051 requires the governing bodies of all public

14  agencies to file certain information, including its official mailing address and clerk's name, with the

15  Secretary of State for inclusion in the roster, within 70 days of its legal existence, and within 10 days

16  after any filed fact changes.  *Id.* § 53051(a)-(b).  If a public agency fails to comply with the initial

17  filing requirements, or keep its roster information accurate, a person will not be barred from suing

18  that agency, for failure to comply with the government claim presentation requirements.  *Id.* § 946.4.

19  In essence, a person suing a public agency is expected to consult the roster to determine the proper

20  destination for their government claim.  *Tubbs v. So. Cal. Rapid Transit Dist*., 67 Cal.2d 671,

21  675-676, 63 Cal.Rptr. 377, 433 P.2d 169 (1967).

22      ACMC asserts the County used the power it received from the legislature to create an

23  independent Hospital Authority.  Mot. at 7:20-26.  ACMC also filed with the Court, County

24  Ordinance 0-98-56, titled the Creation of a County Hospital Authority, Alameda County Adm. Code

25  ch. 2.120, tit. 2.[16]  Docket No. 30, Ex. "a."  ACMC also filed a filing for the Roster of Public

26

27  ———————————

28  [16]    The Court takes judicial notice of this public record under Federal Rule of
Evidence 201(b)(2).

22

1    Agencies, updating a change in the Hospital Authority's officers, from May 2006.[17]  *Id.*, Ex. "d."

2    Plaintiffs ineffectively dispute the existence of the Hospital Authority, independent of the

3    County.  They point to subdivisions of section 101850 which address how the County and the

4    Hospital Authority interrelate, including that the County will retain control of the authority's

5    physical plants, Health & Safety Code § 101850(o), or subdivisions which allow the County to

6    participate in Medi-Cal, despite the authority's creation, *id.* § 101850(i).  Opp'n at 15:3-11.

7    Plaintiffs, however, fail to explain the relevance of these subdivisions.  Nor, as ACMC correctly

8    notes, will the Court simply read section 101850 so as to nullify itself.  Reply at 8:21-9:7.  Finally,

9    plaintiffs make an odd reach to Eleventh Amendment jurisprudence, for the argument that if the

10   County pays ACMC's damages,[18] then the latter must be an arm of the former.  Opp'n at 13-26.  Not

11   only is this allegation beyond the four corners of plaintiffs' Amended Complaint, plaintiffs fail to

12   explain how it defeats subdivision (j) of section 101850.

13           **C.      Plaintiffs fail to plead estoppel.**

14           Having failed to establish ACMC is an "arm" of the County, plaintiffs alternatively argue

15   ACMC is estopped from asserting its independent status to defeat plaintiffs' state claims.  Opp'n

16   at 10:21-11:10.  "A public entity may be estopped from asserting the limitations of the tort claims

17   statutes where its agents or employees have prevented or deterred the filing of a timely claim by

18   some affirmative act."  *Munoz*, 33 Cal.App.4th at 1787.

19           The required elements for an equitable estoppel are:  (1) the party to be

20           estopped must be apprised of the facts; (2) the party to be estopped must intend his or

21           her conduct shall be acted upon, or must so act that the party asserting the estoppel

22           had a right to believe it was so intended; (3) the other party must be ignorant of the

23           true state of facts; and (4) the other party must rely upon the conduct to his or her

24           injury.

25   _____

26   [17]     The Court takes judicial notice of this public record under Federal Rule of
     Evidence 201(b)(2).

27   [18]     Actually, plaintiffs make the unsupported vacuous assertion, "there is no evidence that the

28   County would not be responsible for a judgment that ACMC would not be able to pay."  Opp'n
     at 15:2-3.

1   *Id.*

2       In this case, as ACMC notes in its Reply, plaintiffs' allegation that ACMC and the County

3   "hold themselves out to the public as a single entity and the activities of each are so intertwined that

4   ///

5   the conduct of each should be imputed to the other," does not plead the elements of estoppel.[19]

6   Reply at 7:10-22.  ACMC is correct, and the Court finds no basis for equitable estoppel.

7   Nonetheless, because plaintiffs may be able to cure this defect by amendment, the Court will grant

8   them leave to do so.

9           **D.      The substantial compliance doctrine is inapplicable here.**

10      As ACMC correctly notes in its Reply, because plaintiffs did not serve the correct legal

11  entity, their argument that they "substantially complied" with the Government Claims Act is

12  irrelevant.  *See* Opp'n at 11:13-12:15; Reply at 8:8-13 (citing *Santee v. Santa Clara County Office of*

13  *Educ.*, 220 Cal.App.3d 702, 715-716, 269 Cal.Rptr. 605 (1990)).  Further, as ACMC also correctly

14  notes, plaintiffs' reliance on *Elias v. San Bernardino County Flood Control Dist.*, 68 Cal.App.3d 70,

15  135 Cal.Rptr. 621 (1977) is misplaced.  In *Elias*, plaintiff had a motor vehicle incident on a road

16  controlled by a flood district, but presented his government claim to a county board of supervisors.

17  *Id.* at 72-73.  The appellate court found substantial compliance, however, because the county board

18  of supervisors were ex officio the flood district's board of supervisors.  *Id.* at 73, 75.  *Elias* is

19  inapplicable here, because plaintiffs did not present their claim to a board which controls both the

20  County and ACMC.  *See* Opp'n at 11:17-12:6; Reply at 8:14-17.

21      Further, as ACMC correctly notes, plaintiffs' reliance on *Jamison v. State of California*, 31

22  Cal.App.3d 513, 107 Cal.Rptr. 496 (1973) is also misplaced.  *See* Opp'n at 12:7-24; Reply

23  at 8:18-21.  *Jamison*'s holding that a claim may be served on *any agent* of a public entity, *Jamison*,

24  31 Cal.App.3d at 515, directly conflicts with subdivision (d) of section 915 of the Government

25

26

27  [19]      Plaintiffs also attach exhibits to their Opposition, such as materials from telephone books and
    the Internet.  The Court does not consider these as they are not judicially noticeable, and therefore
28  considering them would transform the proceedings into one for a motion for summary judgment,
    under Federal Rule of Civil Procedure 56.  *See* Fed. R. Civ. P. 12(b).

Code,[20] which requires actual receipt by certain titled agents, and has been rejected as such by a number of courts, including *Del Real v. City of Riverside*, 95 Cal.App.4th 761, 770, 115 Cal.Rptr.2d 705 (2002) (discussing predecessor § 915(c)) and *Life v. County of Los Angeles*, 227 Cal.App.3d 894, 899-901, 278 Cal.Rptr. 196 (1991) (same).

Nonetheless, to the extent the Courts of Appeal still allow a claimant to invoke *Jamison*, under the substantial compliance doctrine, the courts require a claimant to show he or she presented his or her claim to an agent of the public agency which committed the alleged tort. *Westcon Const. Corp. v. County of Sacramento*, 152 Cal.App.4th 183, 202, 61 Cal.Rptr.3d 89 (2007); *Jamison*, 31 Cal.App.3d at 518. But where, as here, there is a complete failure to serve any responsible officer of the public agency which committed the alleged tort, substantial compliance cannot apply. *Westcon*, 152 Cal.App.4th at 202; *Jamison*, 31 Cal.App.3d at 517.

**E.    The waiver doctrine is inapplicable here.**

Plaintiffs' argue they are entitled to the benefit of sections 911 and 911.3 of the Government Code, which provide that unless a public entity timely informs a claimant of defects in their claim, or timely rejects a claim, that entity waives the right to assert as a defense the six-month time limit for presentation, unless the claimant put the wrong mailing address on their claim. Gov. Code §§ 911, 911.3(b); Opp'n at 13:6-14:7. The Court need not analyze the cases cited by plaintiffs, because, as ACMC correctly notes, plaintiffs fail to show they served a claim on ACMC's governing Hospital Authority. *See* Reply at 9:11-10:1. Thus, the authority could not timely inform plaintiffs of any alleged defects or reject their claim. Plaintiffs' waiver arguments are therefore irrelevant.

**III.    Immunity under Sections 820.2, 820.4, or 821.6 of the California Government Code**

ACMC asserts it is immune under Government Code sections 820.2, 820.4, and 821.6. Mot. at 16:8-17:13. Plaintiffs do not oppose these assertions.[21] Because the Court has found in part II,

---

[20]    This subdivision states in part, "[a] claim, amendment or application shall be deemed to have been presented in compliance with this section even though it is not delivered or mailed as provided in this section if it is actually received by the clerk, secretary, auditor or board of the local public entity . . . ." Gov. Code § 915(d).

[21]    The Court deems a failure to oppose an argument as a statement of non-opposition. *Cf.* Standing Order for Civil Cases, ¶ 8 (failure to file an opposition is deemed a statement of non-opposition).

1  *supra*, that plaintiffs' state law claims are time barred, unless ACMC is estopped from asserting this

2  defense, the Court need not address ACMC's state law immunity assertions.  Should plaintiffs later

3  sufficiently plead estoppel, the Court will address these assertions.

4  ///

5  **IV.    Section 52.1 of the California Civil Code**

6      Section 52.1 of the California Civil Code provides remedies:

7      [i]f a person or persons, whether or not acting under color of law, interferes by

8      threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or

9      coercion, with the exercise or enjoyment by any individual or individuals of rights

10     secured by the Constitution or laws of the United States, or of the rights secured by

11     the Constitution or laws of this state . . . .

12  Cal. Civ. Code § 52.1(a).

13      ACMC asserts that plaintiffs' allegations fail to show any "threats, intimidation, or

14  coercion," and thus fail to state a claim under section 52.1 of the Civil Code.  Mot. at 17:15-18:11.

15  For the reasons stated in part III, *supra*, the Court will not reach arguments related to section 52.1,

16  unless it appears ACMC is estopped from asserting a limitations period defense under the California

17  Government Claims Act.

18  **V.    ACMC may not raise entirely new arguments in its Reply.**

19      A reply is provided so a movant may reply to a non-movant's opposition.  It is thus guided

20  and limited in scope by an opposition.  It is not provided so a movant may make new arguments,

21  thus depriving a non-movant of an opportunity to provide an opposition to them.  As such, the Court

22  disregards ACMC's arguments in its Reply not made in response to plaintiffs' Opposition.[22]  *See*

23  Reply at 1:4-15, 11:15-12:27.

**CONCLUSION**

25      Accordingly, the Court GRANTS defendant Alameda County Medical Center's Motion to

26  Dismiss (the "Motion") [Docket No. 29 07-5600] as follows.  Specifically, with regards to counts 3

27  _____

28  [22]    The Court also directs the parties' attention to Civil Local Rule 3-4(c)(2), which requires
footnotes be no smaller than a 12-point standard font, for a computer prepared pleading.

26

1  and 4 for battery and IIED, which are unopposed, the Court DISMISSES them with prejudice.  With

2  regards to count 1 for violating § 1983, count 2 for violating section 52.1, and count 5 for

3  negligence, the Court DISMISSES them but grants plaintiffs leave to amend, under the following

4  briefing schedule, including conforming paragraph 10 of their Amended Complaint [Docket No. 26-

5  5600] to Federal Rule of Civil Procedure 8.  The Court ORDERS that plaintiffs shall have fifteen

6  days from the date of the entry of this Order to file a Second Amended Complaint (the "SAC").  In

7  turn, ACMC shall have fifteen days from the date of service of the SAC upon them, to file an answer

8  or other pleading.

9          In addition, the Court SETS a Case Management Conference for October 16, 2008,

10  at 3:00 p.m.  The parties shall **meet and confer** prior to the conference and shall prepare a joint Case

11  Management Conference Statement which shall be filed no later than ten (10) days prior to the Case

12  Management Conference that complies with the Standing Order for all Judges of the Northern

13  District of California and the Standing Order of this Court.  Plaintiffs shall be responsible for filing

14  the statement as well as for arranging the conference call.  All parties shall be on the line and shall

15  call (510) 637-3559 at the above indicated date and time.

16

17          IT IS SO ORDERED.

18

19          September 9, 2008                              _____
                                                           Saundra Brown Armstrong
20                                                         United States District Judge

21

22

23

24

25

26

27

28